**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

HEISS PRODUCTS, INC., ET AL.,        )
                                                            )

            Plaintiffs,           )

                                                          )        CIVIL ACTION NUMBER:

v.                                                  )

                                                          )          4:25-cv-00091 (CDP)

WATLOW ELECTRIC MANUFACT-    )
URING COMPANY                )

                                                           )
            Defendant.           )

**<ins>RESPONSE IN OPPOSITION TO MOTION TO DISMISS (DOCS. 42-43)</ins>**

COME NOW Plaintiffs, by and through undersigned counsel, and submit this Response in Opposition to Defendant's Motion to Dismiss (Docs. 42–43). For the reasons set forth below, the Court must deny Defendant's motion.

## I.    STANDARD OF REVIEW FOR <ins>FED. R. CIV. P. 12(B)(6)</ins> AND 12(F)

This Court is well versed in the standard for dismissal under <ins>Fed. R. Civ. P. 12(b)(6)</ins>—a complaint that succeeds in identifying facts that are suggestive enough to render plausible the necessary elements of a claim will survive a motion to dismiss. *Chambers v. United States*, <ins>2025 U.S. Dist. LEXIS 109699, at *2</ins> (E.D. Mo. June 10, 2025) (Perry, J.); *Laney v. City of St. Louis*, <ins>2019 U.S. Dist. LEXIS 97510, at *5-6</ins> (E.D. Mo. June 10, 2019) (Perry, J.). The party moving for dismissal under Rule 12(b)(6) bears the burden of showing the plaintiff has failed to state a legal claim, Plaintiffs may use "any set of facts consistent with the allegations of the complaint." . *Ashcroft v. Iqbal*, <ins>556 U.S. 662-663, 677-79</ins> (2009); *Bell Atl. Corp. v. Twombly*, <ins>550 U.S. 544, 563</ins> (2007).

This Court is equally well versed in the standard applicable to motions to strike or dismiss pursuant to <ins>Fed. R. Civ. P. 12(f)</ins>—the rule applies only to pleadings containing an "insufficient

1

defense or any redundant, immaterial, impertinent, or scandalous matter," but striking a party's pleading is "an extreme measure" "viewed with disfavor and infrequently granted." *Laney*, 2019 U.S. Dist. LEXIS 97510 at 6; *McSean v. Lemons*, 2024 U.S. Dist. LEXIS 126989, at *1-2 (E.D. Mo. July 15, 2024) (Perry, J.).

## II.   COUNT I STATES A PLAUSIBLE BREACH OF CONTRACT CLAIM

Watlow moves to dismiss Count I by arguing: (1) that Plaintiffs' First Amended Complaint ("Complaint") fails to identify the specific agreements, the Plaintiffs' rights, and Watlow's obligations; and (2) that the Complaint fails to state a plausible claim for relief because the parties' contract expressly permits Watlow, in its sole discretion, and at any time, to modify the commission rates, etc. related to the compensation of its Sales Agents—Plaintiffs. *See* Def.'s Br. at 8–10.

As to the first point, that argument is plainly incorrect. To properly plead a claim for breach of contract in Missouri, Plaintiffs' Complaint must show: (1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages. *Nat'l Sur. Corp. v. Prairieland Constr., Inc.*, 354 F. Supp. 2d 1032, 1039 (E.D. Mo. 2004) (Perry, J.); *Primary Residential Mortg., Inc. v. Guarantee Title Ins.*, 2005 U.S. Dist. LEXIS 26082, at *5-6 (E.D. Mo. Nov. 1, 2005) (Perry, J.). The Complaint identifies the boilerplate agreements at issue, evidenced by Watlow's ability to locate and submit a sample agreement for the Court's consideration. It also sets forth the relevant contract terms, the Plaintiffs' performance, Watlow's specific obligations to fully fund and fully pay out the commission pools, Watlow's failure to do either, and Plaintiffs' damages—amounts underfunded to which each plaintiff is entitled a percentage share. 1st Amd. Compl. ("Compl.") ¶¶ 2-3, 23-26, 39-74, 99-107, 111-122 (Doc. 38); *See also*, Doc. 43-1.

As to the second point, Watlow essentially contends that it did not underfund the commission pools or underpay Plaintiffs as alleged. Rather it exercised its contractual right to

change the commission rates used to fund the pools—thereby reducing both the total funding obligation and the amounts paid to Plaintiffs. Watlow asserts that Plaintiffs "may no longer like" this provision, but under Missouri contract law, they "cannot now escape the bargain they made." Def.'s Br. at 10. That same principle, however, applies equally to Watlow. As shown below, it is not Plaintiffs' supposed dissatisfaction that warrants dismissal, but rather Watlow's own dissatisfaction with the deal—and its resulting failure to follow the contract's unambiguous terms.

### A. WATLOW HAD NO RIGHT TO UNILATERALLY CHANGE COMMISSION POOL FUNDING RATES WITHOUT WRITTEN NOTICE OF THE CHANGES AND MUTUAL AGREEMENT

Modification of a contract terminates the existing agreement and replaces it with a new, mutually agreed-upon contract. *E.A.U., Inc. v. R. Webbe Corp.*, 794 S.W.2d 679, 686 (Mo. Ct. App. 1990) ("Modification of a contract constitutes the making of a new contract, which, like any other agreement, is enforceable only if based upon mutual assent."). Consistent with that rule, the contract at issue gave Plaintiffs—Watlow's TBSU Sales Agents—these four specific rights or guarantees:

> (b) Designate in writing the selling prices and terms upon which orders for Products shall be solicited and obtained by Agent;

Doc. 43-1 at 4, ¶ 3.(b).

> (b) Either party may terminate this Agreement for any or all of the Products at any time for any reason, without liability and with or without cause, upon at least thirty (30) days' prior notice to the other party. In addition, except as otherwise provided herein, either party may

Doc. 43-1 at 5, ¶ 4.(b).

> 5. **MODIFICATIONS AND AMENDMENTS.** SCHEDULES A, B and/or C may be modified by Watlow, in its sole discretion, upon not less than thirty (30) days' prior written notice to Agent. The parties agree that upon delivery of such notice to Agent, such notice shall have the full force and effect of a mutually executed amendment to this Agreement.

Doc. 43-1 at 6, ¶ 5. Read together, these provisions plainly required Watlow to provide 30 days' advance written notice of any new commission rates it intended to use to fund the commission

3

pools. This notice was a condition precedent to any alteration of the original, express commission rates—in other words, Watlow had to provide advance written notice of its intent to terminate the existing contract and replace it with a new agreement that expressly set forth different commission pool funding rates.[1] As this Court has explained, when the text of a contract is plain and unequivocal, "there is no need to go beyond its explicit instruction" and the "contract is enforced as written." *See Wagner Agency v. Johnson & Johnson, Inc.*, 2025 U.S. Dist. LEXIS 108871, at *11 (E.D. Mo. June 9, 2025) (Perry, J.); *see also CitiMortgage, Inc. v. Chi. Bancorp, Inc.*, 2014 U.S. Dist. LEXIS 124863, at *8 (E.D. Mo. Sept. 8, 2014) (Perry, J.).

To undermine these express protections and eliminate its obligations related thereto, Watlow primarily relies on the general contract provision below to claim that it retained absolute discretion to determine, at any time and without notice, the commission rates used to fund the commission pools:

- Watlow may, in its sole discretion, vary the Commission rate to ensure alignment with its strategic objectives.

Doc. 43-1 at 17 (Excerpt); *See also*, Def's Br. at 8-9 (Doc. 43). But that provision is easily harmonized with the others above when the contract is read as a whole and construed according to established principles of Missouri law. *Compare* Doc. 43-1 at 4 (Watlow shall. . . [d]esignate in writing… terms upon which orders for Products shall be. . . obtained by Agent) *and id.* at 5 (Watlow may terminate this Agreement upon at least thirty (30) day's prior notice to the other

---

[1] *See Juengel Constr. Co. v. Mt. Etna, Inc.*, 622 S.W.2d 510, 513 (Mo. Ct. App. 1981); *Highland Inns Corp. v. Am. Landmark Corp.*, 650 S.W.2d 667, 672 (Mo. Ct. App. 1983) ("In terms of contract law, a condition is defined as. . . 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'"); *see also E.A.U., Inc.*, 794 S.W.2d at 686 (Modification of a contract constitutes the making of a new contract, which, like any other agreement, is enforceable only if based upon mutual assent.); *Crestwood Shops, L.L.C. v. Hilkene*, 197 S.W.3d 641, 655-56 (Mo. Ct. App. 2006) (A condition can qualify the very existence of a contract, such as when the terms of the offer impose a condition upon the validity of a contract.); *CIT Grp./Equip. Fin. v. Integrated Fin. Servs.*, 910 S.W.2d 722, 729 (Mo. Ct. App. 1995) ("[I]f a contract contains a condition precedent, the condition must occur or be performed before the contract takes effect and is enforceable.").

party); *with id.* at 6 (Watlow may modify Schedules A-C with 30 days advance written notice) *and id.* at 17 (Watlow may vary commission rates). Together the provisions relied on by Plaintiffs and Watlow permit Watlow to modify the schedules' commission pool funding rates—but only if done so in writing and with advance written notice of the new rates it will use. *See* Doc. 43-1. This interpretation aligns with the principle that contract modifications require mutual assent—as well as the provision's language calling for modification by "mutual execution"—both impossibilities if Plaintiffs receive no notice of the purported changes. *E.A.U., Inc.*, 794 S.W.2d at 686; *See also* Doc. 43-1 at 6, ¶ 5.

Watlow's proposed interpretation does not create ambiguity because it is not reasonable. *STL Riverview Plaza LLC v. Metro. St. Louis Sewer Dist.*, 681 S.W.3d 290, 301 (Mo. Ct. App. 2023) ("A contract is ambiguous only if its terms are susceptible of more than one meaning such that reasonable persons may fairly and honestly differ in their construction of the terms. A contract is not ambiguous merely because the parties disagree over its meaning.") (citations omitted). Unlike Plaintiffs, Watlow fails to consider the agreement overall. It isolates the broad discretion clause and ignores the more specific provisions that limit when and how it must exercise that discretion. *Nat'l Sur. Corp.*, 354 F. Supp. at 1037 (when interpreting a  contract it must be read as a whole and construed to give meaning to all its terms); *Intertel, Inc. v. G4S Compliance & Investigations, Inc.*, 2010 U.S. Dist. LEXIS 85837, at *9 (E.D. Mo. Aug. 20, 2010) (Perry, J.) (same). As a result, Watlow's interpretation improperly invalidates or nullifies one or more of the express provisions supporting Plaintiffs' claim—including the requirement commission pool funding rates be in writing. *See CP3 BP Assocs. LLC v. CSL Plasma Inc.*, 645 S.W.3d 654, 665 (Mo. Ct. App. 2022) (citing *Chochorowski v. Home Depot U.S.A., Inc.*, 404 S.W.3d 220, 229 (Mo. banc 2013)) (a contract must be read to give meaning to all its terms).

Moreover, Watlow's interpretation would render Plaintiffs' compensation entirely undefined, granting the company unfettered discretion to reduce commission funding rates—and therefore payouts—at any time, including retroactively after partial payments have already been made. *See* Doc. 43-1 at 7 ¶ 1(d); *id.* at 17–18 (Watlow may pay average commissions monthly to be "true[d] up" at year end). Under this view, Sales Agents could fully perform services without knowing what compensation they would receive, if any. Contracts should not be interpreted to produce such absurd and unreasonable results. *CB Commercial Real Estate Grp., Inc. v. Equity P'ships Corp.*, 917 S.W.2d 641, 646–47 (Mo. Ct. App. 1996). Notwithstanding, Missouri courts routinely reject such undefined arrangements as either unenforceable agreements to agree or illusory promises. *See Mha Long Term Care Network, Inc. v. Express Scripts, Inc.*, 2025 U.S. Dist. LEXIS 5179, at *13 (E.D. Mo. Jan. 10, 2025) (contract provisions leaving rates and other terms to future determination are unenforceable); *Green St. 2900 Inv'rs, LLC v. St. Louis Woodworks, Inc.*, 654 S.W.3d 380, 389 (Mo. Ct. App. 2022) (same).

Additionally, paying Plaintiffs a portion of what they were owed under the agreed upon written funding rates, then retroactively reducing the amounts still owed through undisclosed recalculations of the funding required, not only violates the agreed-upon requirement that terms be in writing, discussed *supra*, p. 3, but also Watlow's obligation to fund and pay out the commission pools "in full." Compl. ¶¶ 104-107.

At this stage, the Court must accept Plaintiffs' well-pleaded factual allegations as true—including that Watlow gave no advance written notice of changes to the commission rates used to fund the commission pools, it concealed its changes to commission pool funding, and Plaintiffs continued to serve as Watlow's non-exclusive Sales Agents without knowledge of those changes. *See* Compl., ¶¶ 2-3, 23-26, 39-74, 99-107, 111-122; *see also Chambers*, 2025 U.S. Dist. LEXIS

6

109699, at *2 ("When reviewing a Rule 12(b)(6) motion, I assume that the allegations in the complaint are true, and I construe the complaint in plaintiff's favor."). Accordingly, the original terms remained in effect through the date Watlow terminated Plaintiffs' contracts as part of its restructuring, and Plaintiffs have sufficiently stated a claim for relief under Rule 12(b)(6). *Id.* at ¶¶ 22, 38.

### B.   IF THE CONTRACT IS AMBIGUOUS, PLAINTIFFS' CLAIM STILL SURVIVES

Watlow does not argue in its motion or supporting memorandum that the contract is ambiguous. To the extent it attempts to do so for the first time in its reply, any such argument should be disregarded. Courts in this District routinely hold that arguments raised for the first time in a reply brief are not considered by the court. *Anderson v. Vandergriff*, 2021 U.S. Dist. LEXIS 186833, at *9 n.3 (E.D. Mo. Sept. 29, 2021).

Even if the Court were to consider the parties' arguments and find ambiguity, Plaintiffs' breach-of-contract claim still survives dismissal. Under Missouri law, a contract is deemed ambiguous only when it is fairly susceptible to two or more reasonable interpretations. *See A&L Holding Co. v. S. Pac. Bank*, 34 S.W.3d 415, 418–19 (Mo. Ct. App. 2000); *CitiMortgage, Inc.*, 2014 U.S. Dist. LEXIS 124863, at *8; *see also Zeiser Motors, Inc. v. Sentry Select Ins. Co.*, 2011 U.S. Dist. LEXIS 103291, at *3 (E.D. Mo. Sept. 13, 2011) (Perry, J.). As this Court has explained, ambiguity may arise when a contract promises something at one point and takes it away at another. *Zeiser Motors, Inc.*, 2011 U.S. Dist. LEXIS 103291, at *3; *See also Worley v. Cornerstone Nat'l Ins. Co.*, 558 S.W.3d 536, 541 (Mo. Ct. App. 2018).

If Watlow argues an ambiguity exists because the contract provisions cited by Plaintiffs obligate it to provide written commission rates, 30 days' advance notice, and obtain mutual assent—while the provision(s) it relies on purport to eliminate those requirements—then Plaintiffs

7

still prevail. *Id.* Such an ambiguity is patent, rather than latent, and may be resolved within the four corners of the contract rather than by means of extrinsic aids. *Lutsky v. Blue Cross Hosp. Serv., Inc.*, 695 S.W.2d 870, 875 (Mo. 1985). The Court does so by giving effect to the more specific provisions relied on by Plaintiffs and nullifying the inconsistent general language relied on by Watlow. *A&L Holding Co.*, 34 S.W.3d at 418–19; *Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 346 (Mo. 2006); *Surface v. Ranger Insurance Co.*, 526 S.W.2d 44, 48 (Mo.App. 1975). If, however, this interpretive rule fails to resolve the ambiguity, Plaintiffs' claim still survives based on the extrinsic evidence alleged in their Complaint. *Affordable Cmtys. of Mo., L.P. v. Fannie Mae*, 2014 U.S. Dist. LEXIS 151056, at *10 (E.D. Mo. Oct. 23, 2014) ("Once a court has determined that a contract is ambiguous, the court may consider extrinsic evidence to determine the true intent of the parties.") (Perry, J.).

Here, Watlow's own Director of Sales, Rick Wilkening, acknowledged that the parties intended to give full effect to the contract's requirement of 30-days' advance written notice of commission rate changes and mutual assent. In discussing the elimination of the 9% commission rate, changes to other rates, etc., Wilkening stated that doing so would require "unofficially changing Sch C" "w/o [without] their [the Sales Agents'] sign-off." *See* Compl. ¶ 116; *id.* (Excerpt from Notes). Given his statements, it is clear that Watlow did not understand the contract to grant it carte blanche discretion to vary the commission rates, as it now claims. If that had been its understanding, the changes Wilkening referenced would have been deemed "official" despite the absence of Sales Agent sign-off—not unofficial. Consistent with Plaintiffs' claims that they were not paid in full due to Watlow paying out less than it should have had the commission pools been fully funded, Wilkening also stated that the unofficial change to Schedule C "results in less than 100% being paid out which will reduce expense." *Id.*

8

And if all else fails to resolve the ambiguity, Plaintiffs' claim survives because the Court must construe the contract in their favor and against Watlow as the drafter. Compl., ¶¶ 24, 102 (boilerplate contracts drafted by Watlow); *See Intertel, Inc. v. G4S Compliance & Investigations, Inc.*, 2010 U.S. Dist. LEXIS 85837, at *9 (E.D. Mo. Aug. 20, 2010) (Perry, J.); *Affordable Cmtys. of Mo., L.P.*, 2014 U.S. Dist. LEXIS 151056, at *10–11.

Accordingly, regardless of whether the contract is deemed ambiguous or unambiguous, the result is the same—Count I of the Complaint states a claim upon which relief may be granted. Watlow could not modify the commission pool funding rates or cause the parties to enter a new contract accomplishing the same without first providing a minimum of 30 days' written notice of changes. Since advance notice was never provided, Watlow breached the original contract when it failed to fully fund the commission pools according to those terms, resulting in Plaintiffs' underpayment.

## III.   COUNT II STATES A PLAUSIBLE BREACH OF CONTRACT CLAIM FOR VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Watlow argues that Count II should be dismissed because the implied covenant of good faith and fair dealing cannot override the express terms of the parties' contract. Def.'s Br. at 5-8. According to Watlow, the contract granted it sole discretion to modify commission rates at any time without notice, and Plaintiffs' allegations merely reflect dissatisfaction with Watlow's lawful exercise of that discretion—not bad faith. Def.'s Br. at 6, 10.

As shown above and below, Watlow is wrong on all accounts. Missouri law implies a covenant of good faith and fair dealing in every contract. *Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188 (Mo. Ct. App. 2017). "The purpose of the cause of action is to "prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party." *Id.* at 188. Since a breach of the implied duty is a

contract action, and damages arise from the breach of contract terms, the measure of Plaintiffs' damages for Count II is the same as for Count I. *Id.*; *Amoroso v. Truman State Univ.*, <u>683 S.W.3d 298, 304</u> (Mo. Ct. App. 2024).

A party breaches the covenant of good faith and fair dealing if it acts dishonestly or exercises contractual discretion in a manner that evades the spirit of the agreement and denies the other party the expected benefit of the bargain. *See Rock Port Mkt., Inc.*, <u>532 S.W.3d at 188</u>; *see also Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank and Trust Co.*, <u>464 S.W. 3d 177, 185</u> (Mo. Banc 2015). Plaintiffs have plausibly alleged precisely that—and more.[2]

Plaintiffs have sufficiently alleged facts establishing their claim for breach of contract claim (Count II) based on Watlow's violation of the implied covenant of good faith and fair dealing. Compl. ¶¶ 42-45, 47-74, 103-104, 107-108, 112-116, 118-122; *See also, supra*, pp. 2-9. Taken as true and viewed in the light most favorable to Plaintiffs, these allegations state a plausible claim for breach of the covenant of good faith and fair dealing and are more than sufficient to withstand dismissal under Rule 12(b)(6). Accordingly, Watlow's motion to dismiss Count II must be denied.

## IV.   COUNT III, UNJUST ENRICHMENT, IS PROPERLY PLEADED AS AN ALTERNATIVE TO PLAINTIFFS' BREACH OF CONTRACT CLAIMS

Watlow's primary argument for dismissal of Count III is that an express contract governs the subject matter of the dispute, and under Missouri law a party cannot recover under a theory of unjust enrichment if an enforceable contract exists. Def.'s Br. at 4-5. It contends that since the contract here addresses payments to Sales Agents—the very subject of Plaintiffs' breach of contract claim—there is no basis for an equitable remedy. Yet even Watlow implicitly concedes that if Plaintiffs' contract claim fails, an unjust enrichment claim could survive. Furthermore,

---

[2] Plaintiffs have pleaded Count II in addition or in the alternative to Count I. Discussed *infra*, p. 11, parties are permitted to plead and pursue alternative theories of relief—even without expressly labeling them as such.

Watlow does not challenge the sufficiency of Plaintiffs' factual allegations, aside from a passing assertion that Plaintiffs fail to plead facts supporting the contract's alleged illusoriness. *Id*. at 5.

That argument fails. Watlow's own submission of the contract (Doc. 43-1), and its brief supply the facts necessary to support Plaintiffs' alternative theory. *Iqbal*, 556 U.S. at 679 (when reviewing a complaint under 12(b)(6), the Court may draw on its judicial experience and common sense). As stated previously, Watlow's interpretation of the contract—permitting it to change commission rates at any time without notice, even retroactively and deceptively—renders the agreement illusory—devoid of mutually agreed upon and binding pricing and payment terms. *Mha Long Term Care Network, Inc.*, 2025 U.S. Dist. LEXIS 5179, at *13 (where rates and other terms are left to future determination, they are unenforceable as either agreements to agree or illusory promises).

Accordingly, Count III must survive because Plaintiffs are permitted to plead alternative theories of relief. Federal and state courts in Missouri—including this one—routinely hold that plaintiffs may plead unjust enrichment as an alternative to breach of contract, even where the existence of a contract is also alleged. *Cape Dogwood Redevelopment Corp. v. Glob. Bowling, LLC*, 2019 U.S. Dist. LEXIS 153948, at *9–11 (E.D. Mo. Sept. 10, 2019) (Perry, J.) (collecting cases). This is consistent with Fed. R. Civ. P. 8(d)(2), which expressly permits parties to plead inconsistent or alternative theories of relief. While Plaintiffs ultimately may not recover under both theories, they are not required to elect a theory at the pleading stage, nor are they required to expressly label their unjust enrichment claim as "alternative." *Id.* at *9–10; *See also id.* at 11.

**V.    THE CLASS ACTION ALLEGATIONS SURVIVE BECAUSE WATLOW'S INDIVIDUALIZED INQUIRY ARGUMENT IS A RED HERRING**

Watlow's attempt to strike Plaintiffs' class allegations under Fed. R. Civ. P. 12(f) is nothing more than an improper end-run around the well-established principle that pre-certification

challenges to class allegations are disfavored, and the propriety of class action status can seldom be determined from the pleadings alone. *McCrary v. Stifel, Nicolaus & Co.*, 687 F.3d 1052, 1059 (8th Cir. 2012); *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977). Courts in this circuit consistently express skepticism toward such early attacks using Rule 12(b)(6), emphasizing that dismissal of class claims at the pleading stage is "rare" and "generally disfavored." *See Fry v. Accent Mktg. Servs.,* 2013 U.S. Dist. LEXIS 76425, at *11 (E.D. Mo. May 31, 2013) (Perry, J.); *McCullen v. Union Pac. R.R. Co.*, 2019 U.S. Dist. LEXIS 127226, at *9 (W.D. Mo. July 31, 2019) (collecting cases)).

Rule 12(b)(6) does not permit defendants to circumvent the class certification process and prematurely test the merits of class allegations before plaintiffs have had the opportunity to conduct discovery—and neither should Rule 12(f). *See Saggio v. Medicredit, Inc.,* 2023 U.S. Dist. LEXIS 76191, at *3, 9-10 (E.D. Mo. May 2, 2023) (denying motion to strike class assertions under Rules 12(b)(6) and 12(f)). Allowing Watlow to proceed under Rule 12(f) would subvert these settled principles and improperly preclude Plaintiffs from developing the factual record necessary to substantiate their allegations in support of class certification.

Nevertheless, Plaintiffs' allegations readily satisfy the requirements of Rule 23 at the pleading stage. Plaintiffs allege that each of them was a member of the TSBU Team and that, collectively, they include at least one member from each sub-team that comprised it. *See* Compl. ¶¶ 27-36, 39-41, 76-78, 85. They further allege that all putative class members entered into the same boilerplate, standard-form TSBU contract with Watlow. *Id.* ¶¶ 23-24, 26. Each of those contracts is governed by Missouri law, as expressly stated in the agreement's choice-of-law provision, "without regard to the State's conflicts or choice of law rules." *See* Doc. 43-1 at 11, ¶ 14(a).

Under those contracts, Plaintiffs and the putative class members were paid from the same TSBU commission pools established for them by Watlow pursuant to the agreements. *See* Compl. ¶¶ 42-45. The gravamen of Plaintiffs' class claim is that Watlow implemented a corporate, company-wide policy of underfunding those commission pools—a policy it concealed from its Sales Agents—which resulted in uniform breaches of all TSBU contracts and underpayments to all class members as each Sales Agent was compensated based on a percentage share of the pools. *Id.* ¶¶ 43, 83–84, 86–87. Importantly, Plaintiffs' Complaint does not include a claim challenging the percentage share Watlow assigned to each class member. *Compare Id.* ¶¶ 43, 83-87 *with* ¶ 96. Instead, they allege that all TSBU Sales Agents were harmed in the same manner by Watlow's underfunding of the shared commission pools—though the degree of harm necessarily varied according to the differing percentage shares assigned to each agent. *Id.*

Damages, therefore, are a matter of straightforward mathematical calculation: each class member's previously assigned percentage for a given year multiplied by the total amount Watlow underfunded the commission pool in that year. *Id.* These uniform allegations concerning contract terms, class membership, the nature of the harm, and the method for calculating damages, as well as a single state's governing law, support a finding that common issues will not predominate and that the proposed class is sufficiently cohesive to warrant certification under Rule 23.

Federal Rule of Civil Procedure 23 governs class certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,345 (2011). A class earns certification only if it meets each of the requirements specified in Rule 23(a). *Sandusky Wellness Ctr., Ltd. Liab. Co. v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016). Under Rule 23(a), a party seeking certification must demonstrate what Courts and litigants refer to as numerosity, commonality, typicality, and adequacy of representation. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003).

Watlow does not dispute that the Complaint's allegations adequately satisfy each of these Rule 23(a) elements. Def. Br. at 12-14.

Once these elements are satisfied, the party seeking certification must also demonstrate that the proposed class meets at least one of the requirements set forth in Rule 23(b). *Sandusky Wellness Ctr., Ltd. Liab. Co.*, 821 F.3d at 995. Watlow challenges Plaintiffs' ability to satisfy the predominance requirement of Rule 23(b)(3), primarily relying on the Supreme Court's decision in *Walmart v. Dukes*. Def. Br. at 12-14. But that decision does not undermine Plaintiffs' class claim because Watlow had a common policy—underfund the TSBU commission pools to reduce expenses. *See supra*, p. 8. The *Dukes* Court held that when a general policy is at issue, a common question of law and fact can be properly certified on a class basis. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353, 359 (2011) (holding that a "general policy of discrimination" can satisfy the requirements for class certification and finding that Wal-Mart had no such policy); *see also, Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457-459 (2018) ("The plaintiffs in *Wal-Mart* did not provide significant proof of a common policy of discrimination to which each employee was subject.").[3] The Supreme Court later explained in *Tyson Foods, Inc. v. Bouaphakeo* that it denied class certification in *Wal-Mart* only because there was no "common policy" to which each employee was subject." 577 U.S. at 457-459.

Rule 23(b)(3)'s predominance requirement depends on whether common evidence will have a direct impact on each class member's ability to establish liability. If it does, then individual

---

[3] The Court found that "[t]he only corporate policy" in that case was "Wal-Mart's 'policy 'of allowing discretion by local supervisors over employment matters", which is "just the opposite of a uniform employment practice that would provide commonality needed for a class action" because it is "a policy against having uniform employment practices". *Wal-Mart*, 564 U.S. at 359 (emphasis added; relying on *General Tel. Co. v. Falcon*,457 U.S. 147, 159 (1982) (Holding that because no proof of a "discriminatory pay and promotion policy" was offered, the plaintiffs "have not established the existence of any common question.").

issues do not predominate. *In re Tank Antitrust Litig.*, 2021 U.S. Dist. LEXIS 232424, at *21 (W.D. Mo. Nov. 9, 2021) ("[T]he Supreme Court has made clear representative evidence or a "sample relied upon [by Plaintiffs] is a permissible method of proving classwide liability" only if "each class member could have relied upon that sample to establish liability if he or she had brought an individual action.") (citing *Tyson*, 577 U.S. at 455). That standard is satisfied here.

As shown, *see supra* pp. 2-9, Watlow's alleged discretion to modify commission rates used to fund the commission pools was not validly exercised, as no TSBU Sales Agent received the required advance written notice of any such changes. Accordingly, the original express commission pool funding rates remained in effect across the board.

Watlow admits it changed those rates as a matter of course, asserting a contractual right to do so—thereby establishing a uniform policy or practice and the application of that policy or practice. Plaintiffs' class claim thus turns on a single, common question: Who correctly interpreted the boilerplate TSBU contract under Missouri law—Plaintiffs or Watlow? The answer turns on identical language found in each contract and, if necessary, common extrinsic evidence reflecting Watlow's own understanding and intent. Because if proceeding individually every class member could rely on that same evidence—and the Court's interpretation—the predominance requirement is satisfied. *See Tyson Foods*, 577 U.S. at 457–59 (holding that common proof suffices when its failure would end the litigation for all plaintiffs); *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467–70 & n.5 (2013) (same).

Individual damage issues do not predominate as Watlow alleges. It argues individual inquiries will arise as to each member's compensation because there were individualized reasons it assigned each Sales Agent his percentage share of the commission pools. That argument is immaterial because Plaintiffs' Complaint does not include a claim challenging the percentages

15

assigned. *Compare* Compl. ¶¶ 43, 83-87 *with id.* ¶ 96. The claims concern only Watlow's funding of the pools—not how individual percentage shares were calculated. And while the precise damages owed to each class member may vary, that variation does not defeat predominance.

Where, as here, damages can be determined using a uniform and mechanical formula— each class member's assigned percentage in a given year multiplied by the corresponding amount Watlow underfunded the pool that year. Individualized damages will therefore never overwhelm common issues of fact and law. *In re Genetically Modified Rice Litig.*, 251 F.R.D. 392, 398 (E.D. Mo. 2008) (class certification may be suitable where the calculation of damages is susceptible to a mathematical or formulaic calculation, and the formula proposed by the parties to calculate damages is not clearly inadequate) (Perry, J.).

Consistent with the preceding, and contrary to Watlow's mitigation argument (Def. Br. at 14), it is not apparent at this early stage that individualized minitrials will be necessary. Plaintiffs allege that Watlow concealed its underfunding policy. Compl. ¶¶ 115. The contract shows Plaintiffs were subject to strict confidentiality. *Id.* ¶¶ 115-120; Doc. 43-1 at 2; *id.* at 8-9, ¶ 12; *id.* at 11, ¶ 14(a). As such, mitigation was not a viable option for Plaintiffs outside of litigation—particularly because Watlow was the sole manufacturer or owner of the Watlow-branded products Plaintiffs sold, the contracts purport to establish an agency relationship,[4] and the contracts' non-compete provisions further restricted their competition with Watlow. Compl. ¶¶ 20-21; Doc. 43-1 at 2; 8, ¶ 11; *id.* at 9-11, ¶ 13.

If later the Court has concerns related to any individualized inquiry or issue that may arise, it has several available tools at its disposal for managing and maintaining the case as a class action.

---

[4] An agent owes the principal a duty of loyalty. *Emerson Elec. Co. v. Marsh & McLennan Cos.*, 362 S.W.3d 7, 13 (Mo. 2012).

*Harris v. Union Pac. R.R. Co.*, 2017 U.S. Dist. LEXIS 234241, at *8 n.2 (D. Neb. Mar. 8, 2017) ((1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.); *Sellars v. CRST Expedited, Inc.*, 321 F.R.D. 578, 608-09 (N.D. Iowa 2017) (same).

## VI.   IF THE COURT FINDS ANY PORTION OF THE COMPLAINT DEFICIENT, PLAINTIFFS RESPECTFULLY REQUEST LEAVE TO AMEND

Should the Court find any aspect of the First Amended Complaint deficient under Rule 12(b)(6) or 12(f), Plaintiffs respectfully request leave to amend under Rule 15(a)(2). Leave to amend should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2), and is appropriate where amendment could cure any perceived deficiencies without undue delay or prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

## VII.   CONCLUSION

WHEREFORE, Plaintiffs respectfully request the Court deny Defendant's Motion to Dismiss (Docs. 42-43), or grant Plaintiffs' leave to amend to cure any deficiencies it identifies.

Respectfully submitted,

/s/ Robert J. Camp
Robert J. Camp

**WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, L.L.C.**
rcamp@wigginschilds.com

Mitchell G. Allen
Anthony Michel
**MICHEL ALLEN & SINOR**
mitch@mas-firm.com
anthony@mas-firm.com

17

*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on the __ day of July 2025 I filed the above pleading with the court using the CM/ECF system, which will send a copy to the following:

James F. Bennett
J. Russell Jackson
James B. Martin
**DOWD BENNETT LLP**
jbennett@dowdbennett.com
rjackson@dowdbennett.com
jbmartin@dowdbennett.com

*Attorneys for Defendant Watlow Electric*
*Manufacturing Company*

/s/ Robert J. Camp
**ROBERT J. CAMP**